**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| COMMUNICATIONS GATEWAY CO., LTD., <br>    *Plaintiff,* <br><br>  v. <br><br> GARTNER, INC *et al.*, <br>    *Defendants.* | No. 3:20-cv-00700 (VAB) |

**RULING AND ORDER ON PENDING MOTIONS**

Communications Gateway Co., Ltd. ("Plaintiff" or "CGC") has sued Gartner, Inc. ("Gartner"), Gartner's Chief Executive Officer, Eugene Hall, and Gartner's Chief Financial Officer, Craig Safian (collectively, "Defendants") for alleged violations of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110 *et seq.* ("CUTPA"), tortious interference with business relations, and civil conspiracy. Compl., ECF No. 1 (May 21, 2020).

Defendants have filed a motion to dismiss all of CGC's claims. Mot. to Dismiss, ECF No. 14 (July 17, 2020) ("Defs.' Mot."); Defs.' Mem. of L. in Supp. of Mot. to Dismiss, ECF No. 15 (July 17, 2020) ("Defs.' Mem."). In light of their motion to dismiss, Defendants have also filed a motion for a temporary stay of discovery. Defs.' Mot. for Temp. Stay of Disc., ECF No. 24 (Aug. 3, 2020) ("Defs.' Stay").

For the reasons stated below, Defendants' motion to dismiss is **GRANTED** and the motion for a temporary stay of discovery is **DENIED as moot**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

   **A. Factual Allegations**

   Since around 2001, "CGC and its predecessor company, Communications Gateway

Asia, Ltd. ("CGA"), [allegedly] have been providing business consulting services to various

local and international entities in Thailand, including Gartner." Compl. ¶ 9.

   Gartner allegedly is a "large, multinational company that provides business research,

consulting, and advisory services." *Id.* ¶ 12. Gartner allegedly has "over 120 offices around

the world" and "generated $4.2 billion in revenue in 2019." *Id.* ¶¶ 13-14. CGC alleges that

Gartner "operates many of those offices in the name of other affiliated entities." *Id.* ¶ 15.

   Khun Varavich Hongladarom ("Mr. Varavich") allegedly formed CGA in 2001, and

then formed CGC "at Gartner's request" around 2007. *Id.* ¶ 10. Mr. Varavich allegedly has

served as CGC's founder and director since it was formed. *Id.* ¶ 11.

   After its founding, around 2007, CGC allegedly "continued selling Gartner's

services to various private and public entities in Thailand," under a Sales Agent Agreement

(the "2007 Agreement"). *Id.* ¶ 17. The 2007 Agreement allegedly was "signed by Gartner

Ireland Limited [("GI")], a company based in Dublin, Ireland." *Id.* ¶ 18. The 2007

Agreement allegedly "stated that it would expire on December 31, 2008," and if it was "not

terminated or formally renewed in writing," it would become "a month-to-month agreement

until terminated by either party." *Id.* ¶ 21.

   "The 2007 Agreement [allegedly] provided that Gartner[1] would pay commissions to

---

[1] The Court notes that the Complaint initially defines "Gartner" as the company with a principal place of business in Connecticut, *see* Compl. ¶ 1, but throughout the Complaint Plaintiff seems to use "Gartner" to refer to its subsidiaries, as well. For example, the Complaint states that "CGC and Gartner operated under the []Agreement," *see id.* ¶ 2, yet the Plaintiff makes clear in its reply to Defendants' motion to dismiss that it does not consider it to have had a contractual relationship with Gartner, the parent company, but instead with its affiliates. *See e.g.,* Opp'n to Defs.' Mot. to Dismiss, ECF No. 30, at 1 (Sep. 4, 2020) ("Pl.'s Opp'n MTD") ("This case centers on the

CGC [each month] based on sales revenue received by Gartner . . . . for the prior month's sales." *Id.* ¶¶ 19-20. "CGC and Gartner operated under the 2007 Agreement, and this month-to-month provision, until the end of 2015." *Id.* ¶ 22. "During that time, CGC [allegedly] brought in approximately $15 million of sales for Gartner." *Id.* ¶ 23.

CGC alleges that "almost immediately after the 2007 Agreement was signed, CGC became concerned that Gartner was violating Thai tax laws and regulations." *Id.* ¶ 24. This concern allegedly also was reported by "[n]umerous CGC customers." *Id.* ¶ 25. CGC allegedly "informed Gartner of the[] concerns numerous times" beginning around 2008. *Id.* ¶ 26. Gartner allegedly "repeatedly responded that, because the Gartner research and products sold in Thailand were managed by an Irish entity, which did not have a physical, taxable presence in Ireland, Gartner was not subject to Thai taxes." *Id.* ¶ 27. CGC "disagreed with this analysis," in part, because "Gartner regularly had employees and other representatives in the country for extended periods of time." *Id.* ¶¶ 28-29.

Allegedly in response to voicing its concerns, Gartner told CGC to "refrain from issuing any further e-mails on th[e] matter and strongly advis[ed] that CGC immediately cease and desist from contacting any government authorities or outside advisors regarding taxes as they relate to Gartner." *Id.* ¶ 30 (internal quotation marks and alterations omitted).

Around 2015, the Thai Revenue Department allegedly contacted CGC and some of its customers to ask about Gartner's practices and possible illegal conduct. *Id.* ¶ 32. CGC allegedly "contacted Gartner at the time and informed it of the inquiry from the tax authorities" and hired a law firm "to advise CGC on the issues raised by the government." *Id.* ¶¶ 33-34. The law firm allegedly told CGC "Gartner's Thailand business structure and

Defendants' conduct in Connecticut, not on other parties' contractual relationships in Thailand." (emphasis omitted)).

use of GI to control its Thai operations likely subjected Gartner to tax liability." *Id.* ¶ 35.

It allegedly was after CGC communicated these findings to Gartner that Gartner "decided to transition responsibility for its Thai business to a different entity, Gartner Group (Thailand) Ltd. ('GT')." *Id.* ¶ 38. Around September 2015, "Gartner [allegedly] presented CGC with a new Sales Agent Agreement (the '2016 Agreement'), which would take effect at the beginning of 2016 and replace the 2007 Agreement." *Id.* ¶ 40. CGC alleges that the 2016 Agreement "required" Mr. Varavich "to sign a personal guarantee," the key elements of which were allegedly "presented by Gartner as 'boiler plate.'" *Id.* ¶ 41. Gartner also allegedly "represented to CGC and its customers" that GT was "virtually wholly owned by a Gartner subsidiary, Dataquest Incorporated, based in California," which allegedly "was not a valid, registered entity at that time and has not had a physical presence at the California address Gartner provided." *Id.* ¶¶ 42-43.

After signing the 2016 Agreement, CGC allegedly "continued to sell Gartner's products in Thailand." *Id.* ¶ 44. Similar to the 2007 Agreement, under the 2016 Agreement, Gartner allegedly had "to pay commissions on revenues received from CGC sales." *Id.* ¶ 45. The 2016 Agreement allegedly would expire on January 31, 2017, but like the 2007 Agreement, allegedly, "could continue on a month-to-month basis thereafter until terminated on notice by either party." *Id.* ¶ 46. CGC alleges that "[b]etween January and July 2016, [it] made approximately $1.5 million in sales" under the 2016 Agreement. *Id.* ¶ 47.

On or around August 2, 2016, "Gartner informed CGC that the parties' relationship would not continue beyond the newly set expiration date at the end of January 2017." *Id.* ¶ 48. The "termination notice [allegedly] came in the form of a letter" from Mr. Safian, who

is allegedly "based in Stamford," Connecticut. *Id.* ¶ 50. Mr. Safian's letter allegedly was "delivered to [Mr.] Varavich by two [] Gartner representatives . . . at a meeting on the same date." *Id.* ¶ 51.

At the August 2 meeting, Mr. Varavich allegedly was told that "Gartner wanted CGC to sign a [] 'Transition Agreement' as part of the end of its relationship with Gartner." *Id.* ¶ 53. "Gartner's Thai counsel" allegedly "sent the proposed Transition Agreement to [Mr.] Varavich a week later," on or around August 9, 2016. *Id.* ¶ 55. The Transition Agreement allegedly "contained a 'Full Release & Indemnity' clause." *Id.* ¶ 58. The clause allegedly "required CGC to 'indemnify, defend and hold [Gartner and its affiliates] harmless for any tax . . . which in any way arises out of, or is in any way related to, any alleged or actual act or omission of [Gartner or its affiliates] relating to the Sales Agent Agreement.'" *Id.* (alterations in original).

The Transition Agreement also allegedly "contained a section whereby CGC would agree not to bring or assist in any administrative actions or government complaints," *id.* ¶ 60, even though "Gartner was [allegedly] aware that the Thai authorities were actively investigating Gartner's business practices and tax compliance," *id.* ¶ 61. CGC allegedly "refused to agree to these terms" of the Transition Agreement and "refused to sign" it. *Id.* ¶ 62.

Allegedly "four months before the 2016 Agreement terminated[,] Gartner [] stopped paying commissions on any CGC sales made after August 2016." *Id.* ¶ 66. CGC alleges that "[d]uring the period from August 2016 through January 2017, [it] made new sales that provided over $2.24 million in revenue to Gartner," thereby allegedly entitling CGC "to over $586,000 in commissions." *Id.* ¶ 67. "Gartner has [allegedly] not paid any of those

commissions." *Id.* ¶ 68 (emphasis omitted).

Around the fall of 2016, during this alleged "period of nonpayment" Gartner "wrote to CGC customers" allegedly stating that "GT had operated in Thailand from 1998 through 2007 and ha[d] been dormant during Gartner's relationship with CGC." *Id.* ¶¶ 69-71. Even though Gartner allegedly told CGC customers "it always intended to revive its direct sales model once the market was established in Thailand," Gartner allegedly had "never mentioned GT, its history in Thailand, or its direct sales plan to CGC prior to mid-2015." *Id.* ¶¶ 72-73. CGC alleges that, to the contrary, "Gartner had repeatedly told CGC and CGC's customers that it had no physical presence in Thailand." *Id.* ¶ 74.

Around January 2017, Gartner allegedly "informed CGC, through counsel, that it would be conducting an audit of CGC's compliance with . . . the 2016 Agreement. *Id.* ¶ 77 (internal quotation marks omitted). "[A]round the same time as Gartner was beginning its audit," Mr. Hall allegedly "began contacting CGC's Thai customers by letter" to "inform[] them that Gartner would begin selling its products and services directly to entities in Thailand, through GT." *Id.* ¶ 83. In late January, "[Mr.] Safian allegedly signed [a] Power of Attorney at Gartner's Stamford headquarters and had two other Connecticut-based Gartner, Inc. employees sign as witnesses" to "allow a Gartner employee in Thailand to deal with CGC's former customers." *Id.* ¶¶ 84-85. The Power of Attorney allegedly states that "[Mr.] Safian is an 'Authorized Director' of GT." *Id.* ¶ 86.

Around May 2017, Gartner's counsel allegedly "confirmed . . . that Gartner was withholding commissions while the audit proceeded." *Id.* ¶ 81. CGC alleges that it "endeavored to cooperate and provide information and access to Gartner and its counsel" throughout the audit, *id.* ¶ 87, "but still did not receive payment for any commissions

relating to sales from September 2016 through January 2017," *id*. ¶ 92.

On or around August 27, 2018, "Gartner [allegedly] sent a letter to [Mr.] Varavich and CGC concluding that its audit had 'not revealed any facts indicating a high probability of a compliance violation.'" *Id*. ¶ 93. Later, Gartner allegedly told CGC "that Gartner would only pay the outstanding commission amount after subtracting over $60,000 of accounting and legal costs . . . [allegedly] incurred to conduct the . . . audit after the 2016 Agreement expired." *Id*. ¶ 97. CGC alleges that "[n]either the 2007 Agreement nor the 2016 Agreement requires CGC to pay Gartner's audit expenses and neither Agreement allows Gartner to withhold commission payments as compensation for such costs," *id*. ¶ 98, and "in past years, when Gartner elected to conduct standard accounting audits of CGC's records, Gartner never attempted to recover the related costs from CGC," *id*. ¶ 99.

CGC also alleges that Gartner "conditioned any payment of the [allegedly] owed commissions in 2018 on CGC signing . . . a 'Settlement Agreement.'" *Id*. ¶ 100. The proposed settlement agreement allegedly "required CGC and [Mr.] Varavich to release any and all claims against Gartner and to further indemnify Gartner and its affiliates against potential claims arising from their actions in Thailand." *Id*. ¶ 101.

Around 2019, Thailand's Department of Special Investigations allegedly "evaluated Gartner's historical tax policies and regulatory compliance and referred the case to the country's Ministry of Commerce and Revenue Department." *Id*. ¶ 107.

Gartner allegedly "has not paid any amount of commissions to CGC for [CGC's] sales from September 2016 through January 2017." *Id*. ¶ 103.

### B. Procedural History

On May 21, 2020, CGC filed its Complaint against Defendants with three causes of action: violation of the Connecticut Unfair Trade Practices Act ("Count I"); tortious interference with business relations ("Count II"); and civil conspiracy ("Count III"). Compl.

On July 17, 2020, Defendants filed a motion to dismiss the Complaint. Defs.' Mot.; Defs' Mem.; Decl. of Derek Seow in Supp. of Mot. to Dismiss, ECF No. 16 (July 17, 2020) ("D.S. Decl."); Aff. of Sayan Atthaworadej, ECF No, 17 (July 17, 2020) ("S.A. Aff.").

On July 30, 2020, this Court adopted a scheduling order in this case. Scheduling Order, ECF No. 20 (July 30, 2020) ("Scheduling Order").

On August 3, 2020, Defendants moved to stay discovery. Defs.' Stay.

On September 4, 2020, CGC filed its opposition to Defendants' motion to dismiss. Pl.'s Opp'n MTD.

On September 23, 2020, CGC filed its opposition to Defendants' motion to stay discovery. Opp'n to Defs.' Mot. for Temp. Stay of Disc., ECF No. 33 (Sept. 23, 2020) ("Pl.'s Opp'n Stay").

On September 24, 2020, Defendants filed their reply to CGC's opposition to the motion to dismiss. Reply in Further Supp. of Defs.' Mot. to Dismiss, ECF No. 34 (Sept. 24, 2020) ("Reply MTD"); Reply Decl. of Derek Seow, ECF No. 35 (Sept. 24, 2020) ("Reply D.S. Decl.").

On October 7, 2020, Defendants filed their reply to CGC's opposition to the motion to stay discovery. Reply in Further Supp. of Defs.' Mot. for Temp. Stay of Disc., ECF No. 36 (Oct. 7, 2020).

On March 10, 2021, the Court held a motion hearing. Min. Entry, ECF No. 41 (Mar. 10, 2021).

## II.      STANDARD OF REVIEW

### A. Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss

for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## B. Rule 26(c)

Under Federal Rule of Civil Procedure 26(c), the court has the discretion to stay discovery for good cause. *See* Fed. R. Civ. P. 26(c). The party seeking a stay of discovery bears the burden of showing good cause. *Chamberlain v. Farmington Sav. Bank*, 247 F.R.D. 288, 290 (D. Conn. 2007). While a pending dispositive motion is not, in itself, an automatic ground for a stay, *Josie-Delerme v. Am. Gen. Fin. Corp.*, No. CV 2008-3166(NG), 2009 WL 497609, at *1 (E.D.N.Y. Feb. 26, 2009), a party may establish "good cause" by showing that it has filed a dispositive motion, including a motion to dismiss or to compel arbitration. *Morien v. Munich Reinsurance Am., Inc.*, 270 F.R.D. 65, 67 (D. Conn. 2010) (citing *Cuartero v. United States*, No. 3:05-CV-1161(RNC), 2006 WL 3190521, at *1 (D. Conn. Nov. 1, 2006)).

Courts consider three factors when determining whether a stay of discovery pending a dispositive motion is appropriate: "1) Whether the defendant has made a strong showing that the plaintiff's claim is unmeritorious; 2) The breadth of discovery and the burden of responding to it;

and 3) The risk of unfair prejudice to the party opposing the stay." *Morien*, 270 F.R.D. at 67. Courts may also consider "the nature and complexity of the action[,] the type of motion and whether it is a challenge as a matter of law or to the sufficiency of the allegations, and the posture or stage of the litigation." *Josie-Delerme*, 2009 WL 497609, at *1.

When a dispositive motion would remove the litigation to another forum, good cause may require a stay. *See Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir. 1987) (upholding trial court's decision to stay discovery pending decision on *forum non conveniens* motion, because permitting discovery would defeat the purpose of the motion).

## III.   DISCUSSION

Defendants have moved to dismiss all three causes of action brought against them: the Connecticut Unfair Trade Practices Act claim ("Count I"); the tortious interference with business relations claim ("Count II"); and the civil conspiracy claim ("Count III").

The Court will address each of these claims in turn, but first addresses whether this Court is the appropriate forum for this case, and even if not, whether the subject matter of this lawsuit should be arbitrated, rather than litigated before this Court.

### A.  The Applicability of the Doctrine of *Forum Non Conveniens*

A district court may dismiss an action under the doctrine of *forum non conveniens* when it appears that a foreign forum would be more convenient, fair, or sparing of judicial resources. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,* 549 U.S. 422, 432 (2007). To determine whether *forum non conveniens* dismissal is appropriate, the court must apply a three-step inquiry. *See Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 153 (2d Cir. 2005). "First, the court must determine the degree of deference properly accorded the plaintiff's choice of forum." *Overseas Media, Inc. v. Skvortsov,* 277 F. App'x. 92, 96 (2d Cir. 2008) (internal

11

quotations omitted). Second, the court must determine if there is an adequate alternative

forum. *Id.* Third, if an adequate alternative forum exists, then the court must weigh the relative

convenience of each forum by evaluating certain private and public interest factors and

determining if they weigh in favor of dismissal. *Id.*

Defendants argue that: (1) "Plaintiff's choice of forum is entitled to no deference"; (2)

there is "an adequate alternative forum in Thailand"; and (3) "private and public interests all

reveal Connecticut to be disinterested in the true nucleus of this case, the Thailand-based

business relationship between Plaintiff and Gartner Thailand." Defs.' Mem. at 8. Defendants

argue that this litigation was brought to this Court as evidence of "forum shopping." *Id.* at 9.

In their view, because "Plaintiff is not a U.S. citizen" and "the dominant relationship of

Thailand to the disputed issues . . . Connecticut would be a far less convenient place for Plaintiff

to pursue [its] claims." *Id.* at 10. According to Defendants, the "crux of the allegations of the

Complaint is the retaliatory actions Defendants allegedly took[,] . . including[, *inter alia*,]

terminating the 2016 Agreement . . . and initiati[on] of an audit of Plaintiff's Thai business

records by Thai legal and financial advisors." *Id.* Defendants argue that "[e]vidence of the[]

[alleged] activities is in Thailand," thereby making "Thailand a [] more convenient place for the

Plaintiff to litigate." *Id.* at 11. Defendants claim that CGC's "reluctance to pursue its [allegedly]

contractually agreed-to arbitration rights" is a sign of forum shopping. *Id.*

Defendants also argue that "[f]act witnesses, including employees of Plaintiff, will be

located in Thailand, and to the extent they do not voluntarily submit to discovery, this [C]ourt

would have no means to compel them." *Id.* at 11-12. Defendants argue that "[their] amenability

to suit in Connecticut and availability of legal assistance[] are at best neutral," by relying on the

decision of the district court, in *Melgares v. Sikorsky Aircraft Corporation*, to argue that "a

plaintiff's choice to initiate suit in the defendant's home forum . . . only merits heightened

deference to the extent that the plaintiff and the case possess bona fide connections to, and

conveniens factors favor, that forum." *Id.* at 12 (quoting *Melgares*, 613 F. Supp. 2d 231, 244 (D.

Conn. 2009)).

Defendants further argue that CGC "is eschewing its contractual right to arbitrate its

previously asserted commission claims in favor of bringing claims in the United States that, if

successful, would afford the possibility of punitive damages." *Id.* at 13 (citing *Friedman v.*

*SThree plc*, No. 3:14-CV-378 (AWT), 2018 WL 5993921, at *6 (D. Conn. Sept. 28, 2018)

("[T]he fact that the plaintiff can seek in this action three times his career income losses as

damages under the Connecticut Unfair Trade Practices Act, but cannot do so under [foreign] law,

does not make the [foreign forum] a forum that is not adequate.")).

They argue that "either the Singapore Arbitration Tribunal or the courts in Thailand

provide an adequate forum for this dispute," *id.* at 14 (emphasis omitted), alleging that

"Defendants are amenable to service of process in Thailand"; "the subject matter of this dispute

is litigable in Thailand"; and "Thai courts are independent and well-established, and fully

capable of handling disputes such as this," *id.* at 15.

Finally, Defendants argue that "[t]he private interest factors here favor dismissal because

the vast majority of the critical sources of proof—including both party and non-party witnesses

as well as documents—are located in Thailand or are otherwise outside of Connecticut." *Id.* at

16. They argue further that

> as a matter of public interest, Thailand has a far greater interest in
> the resolution of this dispute. Any court deciding this matter will
> necessarily be required to address not only substantive issues
> regarding Gartner Thailand's tax liability[,] but also the terms of the
> 2016 Agreement, which was executed and carried out in Thailand.

*Id.* at 18.

CGC argues that its lawsuit "center[s] on extracontractual conduct by the Defendants in Stamford, Connecticut." Pl.'s Opp'n MTD at 10. CGC also argues that "much of the evidence and witnesses relevant to that Connecticut activity is likely located within this district, this district is plainly convenient to the defendants, and the private and public interests at play weigh in favor of litigating here." *Id.* In its view, the "decision to come to Connecticut to resolve these claims 'where all defendants were amendable to suit (and where some reside or are incorporated) is properly viewed as a strong indicator that convenience, and not tactical harassment of an adversary, informed its decision to sue outside its forum.'" *Id.* at 13-14 (quoting *Norex*, 416 F.3d at 155).

The Court disagrees.

"The *forum non conveniens* determination is committed to the sound discretion of the trial court," *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 (1981), and the defendant seeking dismissal bears the burden of demonstrating that the forum is not convenient. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 74 (2d Cir. 1998). "Throughout this analysis, the defendant bears the burden of showing that each step tilts strongly in favor of trial in the foreign forum." *In re Ski Train Fire*, 499 F. Supp. 2d 437, 441 (S.D.N.Y. 2007) (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 225 F.3d 88, 108 (2d Cir. 2000)) (internal quotation marks and alteration omitted).

The first factor, the degree of deference to be given to Plaintiff's choice of forum, clearly favors the Defendants. "[T]he choice of a United States forum by a foreign plaintiff is entitled to less deference." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc) (citing *Piper*, 454 U.S. at 255-56, for the proposition that: "When the plaintiff is foreign, . . .

[the] assumption [favoring the plaintiff's choice of forum] is much less reasonable." (alterations in original)). And CGC "is a private limited company organized under the laws of Thailand with a principal place of business in Thailand." Compl. ¶ 2.

Moreover, "the more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." *Iragorri*, 274 F.3d at 71-72. But, as discussed further below, CGC's lawsuit here, after having tried and failed to have similar or the same issues litigated in the courts of Thailand – rather than before the Singapore International Arbitration Centre – suggests the type of forum shopping where little to no deference to CGC's choice of forum is appropriate. *See id.* at 72 ("[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons – such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum – the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts.").

Accordingly, the first factor favors dismissal of this lawsuit on the grounds of *forum non conveniens*.

As to the second factor, "whether an adequate alternative forum exists," *id.* at 73, the availability of an alternative forum, the Singapore International Arbitration Centre, also favors this case's dismissal. While CGC argues that it should be not bound by the 2016 Agreement's arbitrability clause, their claims are so closely related to and dependent upon the 2016

Agreement, that "the subject matter of [this] dispute [is] intertwined with the contract providing for arbitration." *Sokol Holdings v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008); *see id.* ("The promise to arbitrate by *x*, the entity opposing arbitration was reasonably seen on the basis of the relationships among the parties as extending not only to *y*, its contractual counterparty, but also to *y¹*, an entity that was, or would predictably become, with *x's* knowledge and consent, affiliated or associated with *y* in such a manner as to make it unfair to allow *x* to avoid its commitment to arbitrate on the ground that *y¹* was not the very entity with which *x* had a contract.").

Accordingly, the second factor, whether an adequate alternative forum exits, favors granting the motion for *forum non conveniens*.

Finally, having determined that an adequate alternative forum exists, this Court "must balance two sets of factors to ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendants." *Id.* First,

> [there] are the private interest factors – the convenience of the litigants. These include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive."

*Iragorri*, 274 F.3d. at 73-74 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Second, there are "public interest factors," *id.* at 74, such as whether jury service would "be imposed upon the people of a community which has no relation to the litigation," and having a court "untangle problems in conflict of laws, and in law foreign to itself," *id.* (quoting *Gilbert*, 330 U.S. at 508-09).

As to the private factors, while CGC argues that the witnesses and locus of this lawsuit is Connecticut, as Defendants point out, their Complaint focuses on actions and resulting losses connected to events in Thailand. *See, e.g.,* Compl. ¶ 115 ("Gartner's wrongful conduct also includes its withholding of sales commissions GT unquestionably owes to CGC and its attempt to strongarm, coerce, and intimidate CGC by engaging in a lengthy, unwarranted, and baseless audit, all in retaliation for CGC's tax compliance warnings and refusal to execute a Transition Agreement . . . ."); Compl. ¶ 121 ("CGC's losses include but are not limited to the commissions wrongfully withheld by Gartner and GT, renewal commissions that CGC would and should have earned, and interest.").

For example, an audit allegedly undertaken at the request of Defendants is central to CGC's underlying claims. *See, e.g.,* Compl. at 1 (alleging Defendants "initiat[ed] a phony 'audit' of CGC's past work . . . ."); *id.* ¶ 77 (alleging that "after failing to pay any commissions on sales made in the prior four months, and beginning its campaign to convince its Thai customer base to buy its products and services directly, Gartner informed CGC, through counsel, that it would be conducting an 'audit' of CGC's compliance with provisions of the 2016 Agreement relating to various anti-corruption laws, treaties, and regulations"); *id.* ¶ 79 ("Gartner had never conducted any audits relating to CGC's compliance with applicable laws pursuant to either the 2007 Agreement or the 2016 Agreement."); *id.* ¶ 80 ("But now that Gartner had decided to terminate its longstanding business relationship with CGC and withhold unquestionably owed commission payments, it elected to undertake a sham audit to justify its otherwise unsupportable conduct.").

That audit, however, took place in Thailand, not Connecticut, or anywhere else in the United States. *See* D.S. Decl. ¶ 13 ("The entire audit took place in Thailand."). As a result, any witnesses regarding that audit would be in Thailand as well. *See id.* ("Gartner Thailand's audit

team was comprised of legal advisors from a law firm based in Bangkok, Thailand, and financial advisors with an office in Bangkok. To conduct the audit, the audit team was directed by CGC to two different facilities in Thailand. Khun Varavich Hongladarom, CGC's Thai advisor and CGC's legal advisor from a law firm based in Bangkok participated in the audit on behalf of CGC.").

These and other witnesses based in Thailand, however, may not be as readily available in the United States if the case remains here, *see Renesselaer Polytechnic Inst. v. Apple, Inc.*, No. 1:13-cv-0633 (DEP), 2014 WL 12586845, at *4 (N.D.N.Y. Apr. 21, 2014) (summarizing the complications with the taking of depositions of witnesses in Thailand), a matter further complicated by Thailand not being a party to the Hague Evidence Convention, *see* 20: Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (last updated Mar. 4, 2020), http://www.hcch.net/en/instruments/conventions/status-table/?cid=82 (last visited Mar. 31, 2021).

As to the public factors, given that the issues here are inextricably intertwined with matters of Thai law, *see, e.g.*, D.S. Decl. ¶ 13 (referencing the engagement of Thai lawyers by both sides regarding the audit issue), these factors too favor the granting of the motion for *forum non conveniens*. As a result, this third factor, the balancing of the private and public interest factors, weighs in favor of this case's dismissal.

Accordingly, having weighed all of the relevant factors, Defendants' motion to dismiss for *forum non conveniens* will be granted.

### B.  The Arbitrability of the Dispute

Even if the Court did not dismiss this case under the doctrine of *forum non conveniens*, the underlying 2016 Agreement warrants dismissal of this case.

"The Second Circuit has established a two-part for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." *ACE Cap. Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002). If "the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." *Id.* at 29.

Defendants argue that "[t]he 2016 Agreement contains a dispute resolution provision requiring that claims arising out of or in connection with this Agreement be submitted to arbitration." Defs.' Mem. at 20 (internal quotation marks omitted). Defendants argue that CGC "agreed to a valid and binding Arbitration Agreement," *id.* (emphasis omitted), and CGC's "claims fall squarely within the scope of th[at] Arbitration Agreement," *id.* at 24 (emphasis omitted). Defendants further argue that CGC "signed the 2016 Agreement" and "[n]owehere in the Complaint does [CGC] allege that any of the provisions in the 2016 Agreement are invalid." *Id.* at 20. Defendants also allege that "executives and directors of the signatory ([Mr.] Safian) and the non-signatory ([Mr.] Hall and [Mr.] Safian) have a sufficiently close relationship to estop attempts to circumvent an agreement to arbitrate." *Id.* at 23 (citing *Hird v. iMergent, Inc.*, No. 10-cv-166 (DLC), 2011 WL 43529, at *3 (S.D.N.Y. Jan. 6, 2011)).

CGC argues that the Defendants were not parties to the 2016 Agreement, and they therefore cannot enforce its provisions. *See e.g.*, Pl.'s Opp'n MTD at 19 ("[T]he arbitration clause contained in th[e 2016] Agreement only applies to claims between the parties[,] [and] CGC did not agree to arbitrate claims against anyone other than GT, including Defendants." (emphasis omitted)).

Defendants admit "[t]here is a separate question as to whether the valid and binding arbitration clause in the 2016 Agreement extends to the Defendants in this action as non-signatories." Defs.' Mem. at 21. But they argue that "Gartner and its executives are [] not third parties capable of interfering with Gartner Thailand's decision to engage or disengage with a sales agent like the Plaintiff—they are the intended beneficiary of it." *Id.* at 34.

The Court agrees.

As discussed above, because the "subject matter of [this] dispute [is] intertwined with the contract providing for arbitration," *Sokol Holdings*, 542 F.3d at 361 (2d Cir. 2008), Defendants can seek to enforce the 2016 Agreement, particularly since CGC seeks to uses its provisions to further its claims. *Cf. Conn. Gen. Life Ins. Co. v. Houston Scheduling Servs., Inc.*, No: 3:12-CV-01456 (MPS), 2013 WL 4647252 at *9 (D. Conn. Aug. 29, 2013) ("[E]ven if Plaintiff does not rely on the contracts to prove its case – which is doubtful, in light of its repeated allegations about being duped into paying out-of-network rates instead of the in-network rates mandated by the contracts – Defendants will surely raise the contracts as part of their defense, at the very least to argue that they should not, as a matter of equity, be required to reimburse Plaintiff for all amounts paid, but only for those amounts above and beyond those permitted by the contracts."); *id.* at 10 ("The relationship between the non-signatory Defendants and the imaging centers that signed the contracts is sufficient to permit Defendants to compel CGLIC to arbitrate its claim."). Having decided that the 2016 Agreement applies, even if there are doubts about its applicability here, that issue "should be resolved in favor of arbitrability." *ACE Cap. Re Overseas Ltd.*, 307 F.3d at 29. As a result, this dispute should be resolved in arbitration, not here.

Accordingly, if this case was not dismissed under the doctrine of *forum non conveniens*, the arbitrability of these claims under the 2016 Agreement would warrant its dismissal.

### C.  The Underlying Claims

While this case should be dismissed under the doctrine of *forum non conveniens*, or because of the arbitrability of these claims under the 2016 Agreement, each of CGC's claims also fail as a matter of law.[2]

### i.    The Connecticut Unfair Trade Practices Act Claim

The Connecticut Unfair Trade Practices Act provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

> Connecticut has adopted the [Federal Trade] Commission's 'cigarette rule' to determine whether a practice is unfair under CUTPA.  The factors to be weighed . . . are '(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy…; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'

*Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120-21 (2d Cir. 2004) (citation omitted) (quoting *Cheshire Mortg. Serv. Inc. v. Montes*, 223 Conn. 80, 105-06 (1992)); *see Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227-28 (2010) (referencing the cigarette rule's three factors and adding that "not every contractual breach rises to the level of a CUTPA violation").

Defendants argue that "[t]here is no CUTPA claim here because the trade or commerce to which the alleged conduct relates occurred outside of this state, in Thailand." Defs.' Mem. at 30. They allege that CGC has "no connection whatsoever with Connecticut. . . [and] the contract that

---

[2] While Defendants raises statute of limitations issues with respect to each of CGC's three claims, the Court does not reach that issue, finding that these matters – if the case had continued here – would be better addressed after discovery and on a motion for summary judgment, rather than at the motion to dismiss stage. *Cf. Pinkston v. Connecticut*, No. 3:09-cv-633 (JCH), 2009 WL 2852907, at *2 (D. Conn. Sept. 2, 2009) ("While a statute of limitations defense is not ordinarily considered on a motion to dismiss, it is appropriate if the dates in question are undisputed.").

underlies [CGC]'s CUTPA claims expressly states that it is governed by the laws of Thailand." *Id.* at 32.

CGC argues that "CUTPA does apply" in this case, because the claim is that "Defendants violated the statute in Connecticut, causing harm elsewhere." Pl.'s Opp'n MTD at 29 (emphasis omitted). CGC alleges that the "statutory language [of CUTPA] allows a non-Connecticut plaintiff to bring a CUTPA claim against a Connecticut-based company, so long as the allegedly wrongful conduct took place in Connecticut." *Id.* CGC argues that by having claims against "Defendants [] working in Stamford[, Connecticut]" and "Connecticut-based" has "establish[ed] the required 'nexus' between Connecticut and the conduct in question, to state a claim for relief." *Id.* at 32.

The Court disagrees.

The scope of CUTPA "is plain and ambiguous; it proscribes only unfair trade practices occurring within the state of Connecticut." *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 187-188 (2013). There, the Connecticut Appellate Court "decline[d] to give [] effect to [CUTPA] for actions taken in the pursuit of trade or commerce occurring wholly outside the state." *Id.* at 188. While some of the Defendants may be located in the state of Connecticut, *see* Compl. ¶ 111, CGC seeks relief from their decisions regarding business activities that occurred not in Connecticut, but in Thailand, *see id.* ¶ 115. Indeed, the business relationship allegedly wrongfully terminated, the sales commissions allegedly wrongly withheld, and audit inappropriately undertaken, as well as the financial losses allegedly lost as a result of all of these actions, all occurred in Thailand. *See id.*; *id.* ¶ 44; *id.* ¶ 101; *id.* at 1. As the Connecticut Supreme Court held in affirming the Connecticut Appellate Court's decision:

> although Connecticut undoubtedly ha[d] an interest in applying its
> law to ensure that local businesses do not engage in unfair trade

> practices in this state, that interest is not especially strong in the
> present case in view of the limited nature of the contact that occurred
> between the parties in Connecticut.

*W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 561 (2016).

Accordingly, CGC's CUTPA claim, based wholly on business activity occurring in

Thailand, would be dismissed, if this case was not dismissed under the doctrine of *forum non*

*conveniens*, or because of the arbitrability of these claims under the 2016 Agreement.

### ii.     The Tortious Interference with Business Relations Claim

Under Connecticut law,

> [a] successful action for tortious interference with business
> expectancies requires the satisfaction of three elements: (1) a
> business relationship between the plaintiff and another party; (2) the
> defendant's intentional interference with the business relationship
> while knowing of the relationship; and (3) as a result of the
> interference, the plaintiff suffers actual loss.

*Am. Diamond Exch., Inc. v. Alpert*, 101 Conn. App. 83, 90 (internal quotation marks

omitted), *cert. denied*, 284 Conn. 901 (2007). Connecticut courts have "recognized that not every

act that disturbs a business expectancy is actionable," and that the interference alleged must be

"wrongful by some measure beyond the fact of the interference itself." *Id.* As a result, "the

plaintiff must plead and prove at least some improper motive or improper means," and that "the

defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the

defendant acted maliciously." *Id.*

CGC argues that "[it] had a longstanding and existing business relationship with GI as of

2015," Compl. ¶ 130, and "an existing business relationship with GT, beginning January 1,

2016," *id.* ¶ 132. CGC alleges that Defendants "interfered with [its] business relationship with GI

by directing GI to terminate the 2007 Agreement in response to CGC raising valid tax concerns,"

*id.* ¶ 134, and Defendants "interfered with CGC's business relationship with GT by directing GT

to terminate the 2016 Agreement in response to CGC raising its tax concerns," *id.* ¶ 137. CGC argues that Defendants' alleged interference was "to retaliate against and punish [it] for raising . . . tax concerns." *Id.* ¶ 140.

Defendants argue that "'there can be no tortious interference of [a] contract by someone who is directly or indirectly a party to the contract.'" Defs.' Mem. at 32-33 (alteration in original) (quoting *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1035 (2d Cir. 1995)).  Defendants argue that, as the parent company of GI and GT, they could not tortiously interfere by intimidating the plaintiff because "tortious interference with contract requires the use of improper means to induce a party to breach the agreement; thus, the parent's actions had to intimidate the subsidiary, not the plaintiff." *Id* at 33 (internal quotation marks and alterations omitted). Furthermore, they state that they are "not third parties capable of interfering with Gartner Thailand's decision to engage or disengage with a sales agent like the Plaintiff[, because] [Gartner] [is] the intended beneficiary of it." *Id* at 34.

CGC argues that "[t]he Second Circuit was clear that its *Boulevard Assoc*[*iates*] decision does 'not demarcate with precision what sort of behavior on the part of a sole shareholder would be unacceptable.'" Pl.'s Opp'n MTD at 34 (quoting *Boulevard Assocs.*, 72 F.3d at 1037).

The Court disagrees.

The Second Circuit in *Boulevard Associates* affirmed what numerous Connecticut courts already had held that "there can be no tortious interference of contract by someone who is directly or indirectly a party to the contract." 72 F.3d at 1035 (also collecting cases). And "[g]enerally, a parent corporation does not, under Connecticut law, 'tortiously' interfere with a contract when it directs its wholly owned subsidiary to breach a contract that threatens a present economic interest of the subsidiary." *Id.* at 1039. Of course, "a sole

shareholder, motivated purely by self-interest, where that self-interest is contrary to the interests of the subsidiary, could in some circumstances be held liable for tortious interference when it directs its subsidiary to breach a contract." *Id.* at 1038.

But that is not the case here. CGC instead alleges – and the Complaint is replete with allegations – that the Defendants' actions harmed them, not the subsidiaries. *See, e.g.,* Compl. ¶ 103 (alleging that Defendants had "not paid any amount of commissions to CGC for [CGC's] sales from September 2016 through January 2017"). Indeed, CGC's Complaint can only be reasonably construed as alleging that the Defendants acted not against the self-interest of any subsidiary entity in Thailand, but against CGC's self-interest.

Accordingly, even if this case was not dismissed under the doctrine of *forum non conveniens*, or because of the arbitrability of these claims under the 2016 Agreement, CGC's tortious interference claim would be dismissed.

### D. The Civil Conspiracy Claim

To maintain a civil action for conspiracy a plaintiff must prove:

> (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirator pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.

*Macomber v. Travelers Prop. and Cas. Corp.*, 277 Conn. 617, 635-36 (2006) (quoting *Harp v. King*, 266 Conn. 747, 779 (2003)).

There is no independent claim for civil conspiracy, but rather, "[t]he action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself . . . to state a cause of action, a claim of civil conspiracy must be joined with an

allegation of a substantive tort." *Id.* at 636 (citing *Harp*, 266 Conn. at 779 n.37) (emphasis in original).

Defendants argue that CGC "has no viable tort or contract claim to support its civil conspiracy claim," thereby making dismissal of the civil conspiracy claim appropriate. Defs.' Mem at 35.

The Court agrees.

"[T]o state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Macomber*, 277 Conn. at 636. The dismissal of CGC's other claims under CUTPA and for tortious interference with a contract thus is fatal to CGC's civil conspiracy claim.

Accordingly, Defendants' motion to dismiss the civil conspiracy claim would be granted, if the case was not otherwise dismissed because under the doctrine of *forum non conveniens* and the arbitrability of this case.

### E.  The Motion to Stay

"'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *accord Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("[T]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.") (citing *Landis*, 299 U.S. at 254); *see also Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."); *Hicks v. City of N.Y.*, 268 F. Supp. 2d 238, 241 (E.D.N.Y. 2003) ("It is well

established that district courts have discretionary authority to stay a case when the interests of justice so require."). "The person seeking a stay 'bears the burden of establishing its need.'" *Louis Vuitton*, 676 F.3d at 97 (quoting *Jones*, 520 U.S. at 708).

Having determined that this case should be dismissed, the motion to stay is now moot.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED,** and the motion for a temporary stay of discovery is **DENIED as moot**.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE